1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

STEVEN TREVINO,
10  an individual,

11                              NO. CIV. S-07-2106 LKK/DAD

         Plaintiff,
12
      v.
13                                    O R D E R

LASSEN MUNICIPAL UTILITY
14  DISTRICT, et al.,

15
         Defendants.
16  _____/

17      Plaintiffs Steven and Amy Trevino have brought suit against

18  Lassen Municipal Utility District ("LMUD"), Steven Trevino's former

19  employer, and the individually named defendants who are employees

20  of LMUD for alleged harms he suffered related to the termination

21  of his employment.

22      Pending before the court is defendants' motion for summary

23  judgment on plaintiffs' first, second, third, sixth and eighth

24  causes of action. Plaintiffs cross-move for partial summary

25  judgment against LMUD on their first cause of action to the extent

26  that they seek injunctive relief.

                                1

1    The court resolves the motion on the papers and after oral

2 argument.

3                                **I. FACTS[1]**

4    _____

5    [1] Defendants object to several items of evidence offered by
plaintiffs as well as plaintiffs' failure to follow the Local Rules
6 and Rules of Civil Procedure in their motion and opposition to
defendants' motion. First, in violation of Local Rule 56-206, the
7 plaintiffs failed to file a Statement of Undisputed Facts with
their motion for summary judgment. The Statement of Undisputed
8 Facts was not filed until January 15, 2009. Similarly, plaintiffs'
opposition to defendants' motion and supporting documents were not
9 timely filed and served. Although the court could disregard these
untimely filings, it is inclined to resolve the motions on the
10 merits. Plaintiffs also failed to file a response to defendants'
statement of undisputed facts as required by Local Rule 56-260(b).
11 Plaintiffs' counsel is sanctioned in the sum of $150 for each of
the three violations of the court rules, for a total of $450. This
12 sum shall be paid to the Clerk of the Court no later than thirty
(30) days from the effective date of this order.  Counsel shall
13 file an affidavit accompanying the payment of these sanctions which
states that it is paid personally by counsel, out of personal
14 funds, and is not and will not be billed, directly or indirectly,
to the client or in any way made the responsibility of the client
15 as attorneys' fees or costs.
    All facts described in this section are undisputed unless
16 otherwise noted. Due to plaintiffs' failure to timely file a
Statement of Undisputed Facts and to file a response to defendants'
17 Statement of Undisputed Facts, the court treats as undisputed only
those facts to which neither party has directed the court to
18 evidence that tends to show a dispute.
    Defendants also object to several items of evidence plaintiffs
19 have tendered. Among them, defendants object to the minutes of the
LMUD Board meeting that plaintiffs have offered. These exhibits
20 have not been authenticated and their authentication is not
apparent to the court, given that affiant Thomas Beko has not
21 declared where he obtained the minutes nor established his
knowledge of their accuracy, nor are the documents of the type that
22 are self-authenticating. See Affidavit of Thomas Beko In Support
of Plaintiffs' Motion for Partial Summary Judgment ¶¶ 16, 18, 19,
23 26, 28, 29, 37 (Ex. 13, 15, 16, 22, 24, 25, 33). Accordingly, the
court SUSTAINS defendants' objection to these exhibits. Fed. R.
24 Civ. P. 56(e); Fed. R. Evid. 902. Given, however, that defendants
do not seem to dispute that those meetings did occur, the court
25 treats that fact as undisputed.
    Defendants also object to plaintiffs' filing on January 15,
26 2009 of twenty-one exhibits offered in opposition to defendants'
motion. Doc. No. 106. This filing was accompanied by an affidavit

2

**A.    Incident Giving Rise to Disciplinary Action Against Steven Trevino**

On March 10, 2007, Steven Trevino was golfing with a friend at the Diamond Mountain Golf Course. Defendant Frank Cady was, at the time, a shareholder in the golf course as well as General Manager of LMUD. Marino Gianotti, a retired Board member of LMUD, acted as the golf course Marshall. During the off-season, the golf course had a policy that golfers paid for their round of golf by depositing ten dollars in an "honor pay" box on the course.

On March 10, 2007, Trevino and his friend began playing golf at the course without having put any money in the honor box. Gianotti approached them about it and Trevino said he would pay Cady directly on Monday. Gianotti left and called Cady, leaving a message for him at home to the effect that Trevino was there and that he refused to pay. Plaintiffs have tendered evidence that, in this message, Gianotti also relayed that Trevino intended to pay Cady directly on Monday. Affidavit of Thomas Beko In Support of

---

by Thomas Beko that only provides foundation for one of the exhibits. <u>See</u> Opposition by Steven Trevino to Motion for Summary Adjudication, attached Affidavit of Thomas Beko In Opposition to Motion for Summary Adjudication ¶ 4. Most of these exhibits were properly tendered as exhibits in support of plaintiffs' motion for summary judgment or as exhibits to defendants' motion and, to the extent the court relies on them, it has relied on those instead. It appears that the only exhibit offered in document number 106 that was not authenticated and not otherwise properly tendered by either party is Exhibit 2. The court SUSTAINS defendants' objection to this exhibit.

Defendants object to several other items of evidence tendered by the plaintiffs. Many of these items are irrelevant or unnecessary to the disposition of the pending motions. To the extent that the evidence is relevant, defendants' remaining objections are OVERRULED.

1  Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 96)

2  ("Beko Aff.") ¶ 4, Ex. 2. Some time thereafter, Cady called the

3  police and drove to the golf course.

4      Immediately upon arrival, Cady approached Trevino and told him

5  he was being placed on administrative leave. Trevino has testified

6  that Cady "screamed at [him] that [he] was on administrative leave,

7  to turn in [his] keys and [his] car on Monday." Declaration of

8  Cassandra Ferrannini In Support of Defendants' Motion for Partial

9  Summary Judgment ("Ferrannini Decl.") ¶ 7, Ex. F (Steven Trevino

10 Depo. at 51:22-24). According to Trevino, he then "asked him, 'what

11 does this have to do with work?' And he responded to me, just

12 belligerently, 'That's insubordination, you're f,' and as he was

13 saying fired, he spun around and told me to turn in my shit."

14 Trevino Depo. at 52:1-5. In his deposition, defendant Cady

15 testified that, when he arrived at the golf course, he got out of

16 his vehicle and "just let Steve have a barrage of goddamn, what the

17 hell are you doing" and was "mad and heated and yelling."

18 Ferrannini Decl. ¶ 4 Ex. C (Cady Depo. at 170:7-12). Cady confirmed

19 Trevino's recollection of events, which is that he started to tell

20 Trevino he was fired but stopped and instead said he was on

21 administrative leave. Id. at 170:16-25.

22     After this exchange with Cady, Trevino then said to Gianotti,

23 who was nearby, "Buzz, you're dead. What did you say to Frank?"

24 Gianotti reported this to the police officers who had arrived

25 shortly prior. Neither of the officers who were present heard the

26 threat, Ferrannini Decl. ¶ 8, Ex. G (Holman Depo. at 22:15-18),

1   although Officer Holman confirmed that the apparent "threat" was
2   made after Cady told Trevino he was on administrative leave. Beko
3   Aff. ¶ 6 Ex. 4 (Holman Depo. at 47:5-9). Shortly afterwards,
4   Trevino and his friend and Cady left the course.

5   **B.   Events Immediately Following the Incident**

6       Plaintiffs have tendered evidence that later that day, Cady
7   contacted defendant Luhring, LMUD Assistant General Manager and
8   Trevino's direct supervisor, and informed him that Trevino had been
9   placed on administrative leave and asked Luhring to go pick up
10  Trevino's keys. Ferrannini Decl. ¶ 9, Ex. H (Luhring Depo. at
11  60:22-61:15); Trevino Depo. at 16:11-13. Luhring informed Cady that
12  he couldn't do it because he was out of town. Id. at 61:24-25.

13      According to Trevino, later that day LMUD General Counsel
14  Jaimee Jones called him and told him to turn in his company vehicle
15  and his keys. Trevino Depo. at 77:18-79:1. Plaintiffs have tendered
16  evidence that Jones had worked for Cady's law firm as an associate
17  attorney and later a partner until Cady left the firm to be General
18  Manager of LMUD. Cady Depo. at 18:2-22:25. Some time after Cady
19  joined LMUD, Jones was hired as General Counsel. Id. at 23:12-24:2.
20  When he left his firm, Cady sold it to Jones but part of the firm
21  profits continued to be paid into a trust for Cady's children. Id.
22  at 25:6-26:12.

23      Plaintiffs have tendered evidence that two days after this
24  incident, Cady sent an email to Jones, Luhring, and the members of
25  the LMUD Board. Affidavit of Thomas Beko In Support of Plaintiffs'
26  Motion for Partial Summary Judgment (Doc. No. 107) ¶ 4, Ex. 5. In

it, he relayed his version of the events that had occurred on the golf course with Trevino. He then stated that "[t]he crimes committed [by Trevino and his friend] under California law include but are not limited to: 1. Defrauding an innkeeper (a misdemeanor). 2. Assault. 3. Criminal trespass. 4. Conspiracy. 5. Making a death threat," as well as several violations of LMUD's discipline policies, including acting in a way to cause discredit on LMUD, "discourteous treatment of the public, District Board Members or supervisory personnel," and conviction of a crime of moral turpitude. Id. He also stated that he had informed Trevino at the course that he was being placed on administrative leave and that "[v]arious LMUD personnel were contacted." Id. He concluded the letter stating,

> This matter will come before you for an update at the Wednesday Board Meeting as a closed session information only item with no particular action requested. At a later time, when the investigation is completed, this matter will be presented to the Board for action and the proper notices, Skelly and otherwise, will be provided to Mr. Trevino as required by law.

Id.

On March 14, 2007, a closed Board meeting regarding Trevino was held, which Luhring and Cady attended. Luhring Depo. at 76:13-77:11. As a result of the meeting, it was decided that Luhring would act as General Manager in the discipline matter. Id. at 70:18-24. It was the perception of Nancy Cardenas, a member of the LMUD Board of Directors at the time, that Cady "ruled the district with an iron fist" and that Luhring would not practically be able to reverse Cady's discipline decision. Ferrannini Decl. ¶ 11, Ex.

1  J (Cardenas Depo. at 28:13-29:5).

2      On March 19, 2007, Luhring sent Trevino a notice that he was
3  placed on administrative leave. Ferrannini Depo. ¶ 7 Ex. F. The
4  next day, Luhring sent Trevino a "Notice of Intent To Terminate
5  Employment." It advised Trevino that the grounds for termination
6  was Trevino's violation of the LMUD rule that prohibited "any
7  willful act of conduct undertaken in bad faith which either during
8  or outside of duty hours is of such a nature that is causes
9  discredit to fall upon the District." As facts supporting the
10 discipline, the letter described the incident on the golf course,
11 with particular emphasis on Trevino's supposed threat against
12 Gianotti. The letter also stated that witness statements and a copy
13 of the LMUD's discipline policy were enclosed with it, although
14 Trevino has testified that they were not. Beko Aff. ¶ 7 Ex. 5
15 (Trevino Depo. 124:5-15). Finally, the letter advised that a "pre-
16 disciplinary (Skelly)" hearing would be held on March 26, 2007. No
17 witnesses could be called but Trevino could explain why he thought
18 termination was not appropriate and could be represented, if he
19 chose. There is evidence that these two letters, although
20 apparently from Luhring and bearing his signature, had been drafted
21 by Jones. Luhring Depo. 87:25-88:10, 100:4-16.

22 **C.   LMUD's Discipline Policy**

23     LMUD's discipline policy is described in its "General Manager
24 Administrative Procedure 2006-03." Ferrannini Decl. ¶ 7 Ex. F. It
25 was created and enforced by Cady. See Defs.' SSUF ¶ 25.

26     Among other conduct, it prohibits employees from performing

7

"any willful act of conduct undertaken in bad faith which either during or outside of duty hours is of such a nature that is causes discredit to fall upon the District." It provides for progressive discipline, including suspension and dismissal.

In cases where the employee was suspended for more than three working days, demoted, or terminated, the employee may request a Skelly hearing within five days of receipt of the notice of the discipline. The General Manager "shall" hold the Skelly hearing within five working days of the employee's request and shall issue a written opinion five working days thereafter. The employee may appeal an adverse decision within five working days of receiving it. "All efforts shall be made to schedule the hearing within 30 days of the Notice of Appeal."

The appeal is resolved with an appeal hearing to be conducted by a Standing Hearing Officer or a party neutral to the dispute with legal training sufficient to conduct the hearing. If there is no Standing Hearing Officer, a hearing officer is chosen by the Board at its next scheduled regular meeting. The hearing officer shall receive evidence at the appeal hearing. Upon mutual agreement of the employee and the District, or upon the hearing officer's request, the parties may submit briefs in lieu of the hearing. The hearing officer then recommends whether to affirm, modify, or overturn the disciplinary action, in a written report supported by findings of fact. The report shall be issued "as soon as possible" after the hearing. The Board shall then consider the report at its next regularly scheduled meeting and make a final decision

1  regarding the disciplinary action.

2  **D.   Pre-termination Hearing**

3       Trevino's pre-termination hearing was held on March 26, 2007.
4  He was represented by counsel at the time. Counsel had requested
5  a continuance of the hearing because witness statements and copy
6  of the discipline policy had not been provided to Trevino, although
7  they had been purportedly included in his Notice of Intent to
8  Terminate Employment. Counsel also asked for all records upon which
9  the District intended to rely at the hearing and for the hearing
10  to be conducted by a neutral hearing officer, which, according to
11  Trevino's counsel, Luhring was not. Counsel's request for a
12  continuance of the hearing was denied.

13       Plaintiffs' counsel submitted a written response to the Notice
14  of Intent to Terminate Employment on March 24, 2007. It contained
15  a description of the golf course incident and legal argument. This
16  was sent to and apparently received by Luhring.

17       The pre-termination hearing was held on March 26, 2007 with
18  Luhring acting as the hearing officer. Apparently, no live
19  testimony was offered; instead, Trevino offered only the March 24,
20  2007 letter prepared by his counsel. Affidavit of Steven Trevino
21  In Support of Motion for Summary Judgment ("Trevino Aff.") ¶ 15.
22  Luhring has testified that he conducted no independent
23  investigation of the golf course incident and spoke to none of the
24  people who had been present about it, including Cady and Trevino;
25  instead, he relied on written statements by Cady and Gainotti.
26  Luhring Depo. at 70:18-73:15.

On May 8, 2007, Luhring issued a written decision to terminate Trevino. Plaintiff has tendered evidence that Luhring knew that the decision was supposed to have issued five days after the hearing. Luhring Depo. at 119:7-120:13. Luhring testified that he did not comply with this deadline because he knew that Trevino was being paid during this time and because he wanted to have enough time to make the right decision. Id. at 119:7-120:3.

In the decision, Luhring stated that Trevino was terminated based upon a "review of the information available, the charges contained within the Notice of Intent to Terminate, [Trevino's] written response to those charges, the information presented in at the hearing on March 26, 2007, and all other supporting evidence submitted." Ferrannini Decl. ¶ 7 Ex. F. He concluded that this supported a finding that Trevino had violated LMUD's rules by acting in bad faith so as to discredit the District.

The decision also described the process that had been provided Trevino. In describing the March 26, 2007 hearing -- which it identified as a Skelly hearing -- it stated, "At the hearing, you had the opportunity to address the facts upon which the District relied for its intention to terminate you. You chose not to testify or present live testimony from any other witnesses at that hearing despite the opportunity to do so." Id. at 2. Finally, it advised Trevino of his right to appeal pursuant to the General Manager Administrative Procedure 2006-03 ("GMAP 2006-03").

Luhring has testified that it was Trevino's "death threat" to Gianotti that warranted his termination. Defs' SSU ¶ 47. He also

testified that, in making his termination decision, he did not rely on Trevino's failure to present witnesses at the March 26, 2007 hearing. Luhring Depo. 103:20-104:16.

Luhring's decision was sent to Trevino on May 10, 2007. On May 11, 2007, Trevino filed an appeal.

**E.   Post-termination Events**

On June 1, 2007, Trevino began working as a temporary Electrical Superintendent for the Truckee-Donner Public Utility District. He has testified that he was motivated to do so out of a need for health care benefits for his wife, who was being treated for breast cancer.[2] Trevino Aff. ¶ 16. He was at some point contacted by "numerous individuals," including local news reporters, about his termination, although he had not previously discussed the matter with them. Id. ¶¶ 11-13.

Plaintiff has tendered evidence that on June 4, 2007, he drafted and faxed to defendants' counsel a letter seeking an update on the status of Trevino's appeal, including whether a hearing officer had been appointed. Beko Aff. ¶ 17, Ex. 14.

According to defendants, the next regularly scheduled Board meeting occurred on July 24, 2007.[3] Luhring Depo. 142:12-16. At the

[2]Plaintiffs have tendered evidence that Luhring knew in 2006 that Amy Trevino had been diagnosed with breast cancer and that he spoke to her about it in December, 2006. Luhring Depo. 79:10-80:20.

[3]Prior to this, the Board had held "special," closed meetings to address pending litigation. Pls.' SSUF ¶ 173. Cady has testified that he was not present at those meetings. Cady Depo. at 245:11-21.
Plaintiffs have also tendered evidence that the Board typically held regular meetings once a month, but Luhring did not

1  July 24, 2007 meeting and upon Jones' recommendation, the Board
2  appointed Truckee attorney Steven Gross as the hearing officer for
3  Trevino's appeal. Trevino was notified of this by letter on July
4  26, 2007.

5      Trevino contended at the time -- and maintains this position
6  in the instant suit -- that Gross was not impartial and neutral.
7  It is undisputed that in 2005 Gross assisted LMUD in reviewing
8  Cady's employment contract, among other matters. Defs.' SSUF ¶ 61.
9  Plaintiffs have tendered evidence that in 2006, Gross was assisting
10 in the preparation of a new contract to reappoint Cady as General
11 Manager. Cady Depo. 42:10-14. He also represented LMUD in a matter
12 before the Public Employees Relations Board and provided LMUD legal
13 advice in administrative and employment matters in spring and
14 summer of 2007. Id. at 52:5-56:22. Cady spoke with Gross several
15 times during the course of that representation. Id. Plaintiffs have
16 also tendered evidence that Board members knew that Gross had
17 represented LMUD on other matters at the time that it appointed him
18 as hearing officer. Ferrennini Decl. ¶ 5 Ex. D (Nagel Depo. at
19 25:21-26:13), ¶ 12 Ex. K (Langston Depo. at 41:24-42:8).

20     According to Gross, he had never personally represented Cady
21 or Luhring. Ferrannini Decl. ¶ 10, Ex. I (Gross Depo. at 30:10-
22 31:5). Gross also testified that to the best of his recollection,
23 he was not representing LMUD on any other matters at the time he
24 was appointed hearing officer. Id. at 56:3-7.

25 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26 know why regular meetings were not held in May or June, 2007.
   Luhring Depo. at 142:17-143:7.

1    In any event, Gross stepped down as hearing officer on October

2    23, 2007. Luhring Depo. 154:22-155:18. He did so due to his

3    perceived "conflict of interest in representing the board with Mr.

4    Cady [and] representing the board with Mr. Trevino." Ferrannini

5    Decl. ¶ 11 Ex. J (Cardenas Depo. at 57:13-19). During the time that

6    he was hearing officer, he did not conduct Trevino's appeal

7    hearing, on account of the "press of business." Gross Depo. at

8    53:7-16.

9    On October 23, 2007, the Board charged Jones with selecting

10   a new hearing officer.[4] She retained attorney Mike Fitzpatrick for

11   this role on October 26, 2007. Trevino's counsel was notified of

12   this by letter, in which defendants' counsel stated the Fitzpatrick

13   was selected in an attempt to accommodate Trevino's request for a

14   neutral hearing officer and his prior objections to Gross. Beko

15   Aff. ¶ 30, Ex. 26. It informed Trevino that Fitzpatrick would be

16   able to conduct Trevino's appeal hearing on November 15, 2007. Id.

17   By letter dated October 29, 2007, Trevino's counsel agreed that

18   Trevino would appear at the November 15, 2007 hearing and requested

19   Trevino's personnel file and that certain LMUD staff be present at

20   the hearing for questioning. Id. ¶ 32, Ex. 28. On November 7, 2007,

21   Trevino's counsel sent a follow-up letter to LMUD's counsel,

---

[4] Plaintiffs have also tendered evidence that at this Board
meeting, some Board members resigned their positions out of concern
over Cady's behavior and treatment of employees. Cardenas Depo.
75:1-76:24; Beko Aff. ¶ 38, Ex. 34 (Sargent Depo. at 30:1-31:19).
At least two Board members have testified that they were not fully
informed about what was occurring in the Trevino disciplinary
matter. Ferrannini Decl. ¶ 5, Ex. D (Nagel Depo. 61:4-24); Sargent
Depo. at 88:24-89:15.

1  seeking confirmation of the November 15 hearing date. <u>Id.</u> ¶ 31, Ex.

2  29.

3      At some point, the LMUD Board voted to reinstate Trevino to

4  his former position. Ferrannini Decl. ¶ 13, Ex. L (Wood Depo. at

5  78:25-79:2). One Board member has testified that he believed

6  Trevino's conduct was not of the nature that would bring discredit

7  on the District. Sargent Depo. at 40:12-22.

8      On November 9, 2007, defendants' counsel sent a letter to

9  Trevino's counsel, offering to reinstate him and including a check

10  for $41,118.30 in back pay. A copy of Trevino's personnel file was

11  enclosed. <u>Id.</u> ¶ 32, Ex. 30. Trevino rejected the offer of

12  reinstatement by letter on November 15, 2007, expressing concern

13  about Cady's possible retaliation against him and displeasure with

14  the Board's handling of his disciplinary action. <u>Id.</u> ¶ 33, Ex. 31.

15  He stated that he would not consider returning to LMUD until Cady

16  was no longer in a position of control over him and without

17  assurance by the District that it would comply with LMUD's

18  employment policies.[5] <u>Id.</u>; <u>see also</u> Trevino Depo. at 178:1-180:3.

19  Trevino cashed the check for back pay. Trevino Depo. at 183:2-17.

20  LMUD has since extended reinstatement offers to Trevino twice.

21  Ferrannini Decl. ¶ 7, Ex. F. The second time, on January 17, 2008,

22  defendants' counsel also informed Trevino's counsel that Cady was

23  no longer employed at LMUD. <u>Id.</u>

24  ─────────────

25      [5]Defendants also represent that Trevino requested that the
    Board announce publicly that his termination had been improper, but
26  cite no evidence substantiating this. <u>See</u> Defs.' SSUF ¶ 81.

14

**F.    Procedural History**

Plaintiffs filed the instant suit in this court on October 5, 2007. On November 10, 2007, the defendants moved to dismiss and strike, which the court granted in part on January 29, 2008, with leave to amend. Plaintiffs have since filed a Third Amended Complaint, which is the operative complaint. In their Third Amended Complaint, plaintiffs allege six causes of action: deprivation of their procedural due process rights, deprivation of their substantive due process rights, conspiracy to deprive plaintiffs of those rights, defamation, infliction of emotional distress, and failure to produce a public record in violation of state law.[6] They seek declaratory and injunctive relief, damages, and attorneys fees.

**II. STANDARD FOR A MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56**

Summary judgment is appropriate when there exists no genuine issue as to any material fact. Such circumstances entitle the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995). Under summary judgment practice, the moving party

////

---

[6]Their stand-alone claim for LMUD's failure to follow its policies in terminating Steven Trevino was dismissed on April 9, 2008. Plaintiffs have since dismissed their claims against Marino Gainnotti, who had been named as a defendant in the Third Amended Complaint.

1     always bears the initial responsibility of informing the
      district court of the basis for its motion, and
2     identifying those portions of "the pleadings,
      depositions, answers to interrogatories, and admissions
3     on file, together with the affidavits, if any," which it
      believes demonstrate the absence of a genuine issue of
4     material fact.

5    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed.

6    R. Civ. P. 56(c)).

7        If the moving party meets its initial responsibility, the

8    burden then shifts to the opposing party to establish the existence

9    of a genuine issue of material fact. Matsushita Elec. Indus. Co.

10   v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986); see also First

11   Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89

12   (1968); Secor Ltd., 51 F.3d at 853. In doing so, the opposing party

13   may not rely upon the denials of its pleadings, but must tender

14   evidence of specific facts in the form of affidavits and/or other

15   admissible materials in support of its contention that the dispute

16   exists. Fed. R. Civ. P. 56(e); see also First Nat'l Bank, 391 U.S.

17   at 289. In evaluating the evidence, the court draws all reasonable

18   inferences from the facts before it in favor of the opposing party.

19   Matsushita, 475 U.S. at 587-88 (citing United States v. Diebold,

20   Inc., 369 U.S. 654, 655 (1962) (per curiam)); County of Tuolumme

21   v. Sonora Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001).

22   Nevertheless, it is the opposing party's obligation to produce a

23   factual predicate as a basis for such inferences. See Richards v.

24   Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). The

25   opposing party "must do more than simply show that there is some

26   metaphysical doubt as to the material facts . . . . Where the

16

1  record taken as a whole could not lead a rational trier of fact to

2  find for the nonmoving party, there is no 'genuine issue for

3  trial.'"  Matsushita, 475 U.S. at 586-87 (citations omitted).

4                          **III.  ANALYSIS**

5      Defendants move for summary judgment on the following causes

6  of action: deprivation of plaintiffs' procedural due process

7  rights, deprivation of their substantive due process rights,

8  conspiracy to deprive plaintiffs of those rights, infliction of

9  emotional distress, and failure to produce a public record in

10  violation of state law.

11      Plaintiffs cross-move for partial summary judgment. Although

12  it is not altogether clear from their motion, plaintiffs appear to

13  seek summary judgment against LMUD on their first cause of action,

14  which allege deprivation of their procedural due process rights,

15  to the extent that they seek injunctive relief. See Pls.' Mot. for

16  Summ. J. at 20:16-18.

17      The court grants each motion in part.

18  **A.   Due Process Claims**

19      Defendants move for summary judgment on the plaintiffs' first,

20  second, and third causes of action, which allege violations of

21  plaintiffs' procedural and substantive due process rights and a

22  conspiracy to violate those rights, respectively.[7] Defendants'

23  motion asserts that defendants Cady and Luhring are protected by

24  _____

25      [7]Defendants do not seek summary judgment on the third cause
26  of action for any reasons distinct from the reasons for which they
    seek summary judgment on the first and second causes of action.

qualified immunity and that LMUD is not liable under <u>Monell</u>. Defendants also argue that the evidence does not show that a reasonable jury could find that either plaintiff's rights were violated.

Plaintiffs concede that their substantive due process claim is moot but seek attorneys fees for it. Plaintiffs also cross-move for summary judgment against LMUD on their first cause of action, for violation of their procedural due process rights, and ask the court to issue an injunction reinstating Steven Trevino in his former position and requiring that LMUD and its agents comply with LMUD policies should future disciplinary actions be taken against Steven.

The court considers each of these arguments in turn, beginning first with the allegation of Steven Trevino and then considering the allegations of Amy Trevino.

**1.    Violation of Steven Trevino's Procedural Due Process Rights**

Defendants first dispute that a reasonable jury could find that Steven Trevino's procedural due process rights were violated by the defendants' conduct surrounding Trevino's termination. The court disagrees.

In <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532 (1985), the Supreme Court established the framework for analyzing a procedural due process claim where termination of public employment was at issue. As a threshold matter, a public employee's property interest in his continued employment is defined by state law. <u>Id.</u>

18

at 538-39. For example, if a statute or other independent source provides that the employee will only be terminated for cause, the employee has a property interest in his employment such that he is entitled to some measure of due process in a termination procedure. Id. Here, the parties do not dispute that Steven Trevino could only be terminated for good cause, thus establishing a property interest in his employment so as to implicate his due process rights.[8]

The employee's due process interest requires, inter alia, that he not be terminated without notice and an opportunity to be heard. Id. at 542. "Some form of pre-termination hearing" is required. Id. The precise contours of the hearing rely on a balancing of the employee's interests, the government's interest in prompt personnel decisions, and the risk of erroneous termination decisions. Id. at 543, 545. Given this, the pre-termination hearing must include, at a minimum, oral or written notice to the employee of the charges against him, explanation of the employer's evidence, and an

---

[8]The Supreme Court has also recognized an employee's liberty interest in his reputation and the due process rights attendant to that interest. See, e.g., Loudermill, 470 U.S. at 547 n. 13. Plaintiff Steven Trevino has not pled this as the basis of his claims; instead, he alleges that he possessed a Constitutionally protected property interest in continued employment. See Third Amended Complaint ¶¶ 45-69. The court disregards the arguments plaintiffs raise in their opposition brief on this issue, as they lie outside the scope of the pleadings. See Pls.' Opp'n to Defs.' Mot. for Summ. J. at 21. Defendants' references to cases discussing the due process rights that attach to this liberty interest are similarly unhelpful to the court's analysis. See, e.g., Codd v. Velger, 429 U.S. 624, 627 (1977) (per curium); see also Matthews v. Harney County, Or., Sch. Dist. No. 4, 819 F.2d 889, 894 (9th Cir. 1987) (the due process requirements attaching to a liberty interest may be more rigorous than those attaching to only a property interest).

1   opportunity for the employee "to present his side of the story."
2   Id. at 546. In Gilbert v. Homar, 520 U.S. 924, 927 (1997), the
3   Court clarified that it envisioned the pre-termination hearing as
4   "very limited," while a post-termination hearing would be "more
5   comprehensive."

6        A post-termination hearing also must occur "at a meaningful
7   time" and "the existence of post-termination procedures is relevant
8   to the necessary scope of pre-termination procedures." Loudermill,
9   470 U.S. at 547 & n. 12. Regarding the timing of the post-
10  termination hearing, the Court cautioned that "at some point, a
11  delay in the post-termination hearing would become a constitutional
12  violation" although the nine-month delay in that case was not a *per*
13  *se* violation. Id. at 547; see also Gilbert, 520 U.S. at 932
14  (suspension without pay implicates plaintiff's due process rights
15  depending in part on the length of the deprivation, so the
16  promptness of a post-suspension hearing is relevant). Whether a
17  delay in a post-termination hearing constitutes a due process
18  violation depends on "the importance of the private interest and
19  the harm to this interest occasioned by delay; the justification
20  offered by the Government for delay and its relation to the
21  underlying governmental interest; and the likelihood that the
22  interim decision may have been mistaken." Federal Deposit Ins.
23  Corp. v. Mallen, 486 U.S. 230, 242 (1988) citing Mathews v.
24  Eldridge, 424 U.S. 319 (1976). The state's interest in the delay
25  must be "substantial" to survive constitutional scrutiny. Id. at
26  243.

1        Courts have also emphasized the importance of the hearing
2   officer's impartiality in the termination process. In <u>Clements v.</u>
3   <u>Airport Authority of Washoe County</u>, 69 F.3d 321, 332 (9th Cir.
4   1995), the court held that plaintiff's allegations that her post-
5   termination hearing was flawed due to administrator's bias "stated
6   a valid due process claim." The court observed that "[a]t a
7   minimum, Due Process requires a hearing before an impartial
8   tribunal." <u>Id.</u> citing <u>Ward v. Village of Monroeville</u>, 409 U.S. 57,
9   59-60 (1972) and <u>Marshall v. Jerrico</u>, 446 U.S. 238, 241-42 (1980).
10  The court clarified, however, that "the decisionmaker in a *pre-*
11  *termination* hearing need not be impartial, so long as an impartial
12  decisionmaker is provided at the post-termination hearing." <u>Id.</u> at
13  332 n. 15 (emphasis in original).

14       The Ninth Circuit has repeatedly emphasized the importance of
15  the decisionmaker's neutrality in the due process context. <u>See</u>,
16  <u>e.g.</u>, <u>Walker v. City of Berkeley</u>, 951 F.2d 182, 184 (9th Cir. 1991)
17  (defendant employer failed to provide plaintiff due process at
18  post-termination hearing because same attorney acted as adjudicator
19  and represented the defendant in related civil suit for wrongful
20  termination); <u>Brady v. Gebbie</u>, 859 F.2d 1543 (9th Cir. 1988) (in
21  the context of a reputational injury implicating plaintiff's
22  liberty interest, evidence that hearing officer would have
23  disregarded evidence plaintiff presented indicated that plaintiff
24  was denied due process); <u>see also</u> <u>Vanelli v. Reynolds Sch. Dist.</u>
25  <u>No. 7</u>, 667 F.2d 773, 780 (9th Cir. 1982) (holding that plaintiff
26  had tendered insufficient evidence to show that one of the decision

makers in his termination decision was biased against him, such that his due process rights were violated); <u>Coleman v. Dep't of Personnel Admin.</u>, 52 Cal. 3d 1102, 1121 (1991) (post-termination hearing must be performed by an "impartial and disinterested decision maker").

Here, plaintiffs have tendered sufficient evidence from which a reasonable jury could find that Steven Trevino did not receive the process due in the termination proceedings against him. While it is undisputed that a pre-termination hearing was held for Trevino, at which time he was able to contest the charges against him and for which he received written notice of the alleged violation and its basis, there is also evidence from which a jury could infer that the hearing was constitutionally infirm.

First, there is some evidence that Luhring, as Cady's subordinate, would likely not have reversed the discipline decision that Cady had made. <u>See</u> Cardenas Depo. at 28:13-29:5. There is also evidence that the Board members understood this at the time Luhring was selected as the hearing officer for the pretermination hearing. <u>Id.</u>

Second, the process afforded Trevino at the pretermination hearing was minimal. He was not permitted to call witnesses at it, indeed Luhring examined no witnesses at the hearing or prior to it. Luhring Depo. at 70:18-73:15. The sparseness of the process provided at this hearing is not in and of itself constitutionally problematic, but a reasonable jury could find that it was deficient in light of the delayed -- and ultimately non-occurring -- post-

1   termination hearing. See Loudermill, 470 U.S. at 547 & n. 12.

2      A reasonable jury could also find that the Board's initial

3   selection of Gross as a hearing officer for the post-termination

4   hearing indicates a lack of neutrality and impartiality in the

5   process. See Clements, 69 F.3d at 332 n. 15; see also Ward, 409

6   U.S. at 59-60; Marshall, 446 U.S. at 241. There is evidence that

7   Gross had, in the years before the plaintiff's discipline action,

8   represented the District in other employment matters. See Cady

9   Depo. at 52:5-56:22. In this context, he had often met with Cady

10  and had been involved in some capacity with the preparation of

11  Cady's 2006 employment contract. Id. at 42:10-14, 52:5-56:22. Gross

12  himself testified that he stepped down from the role of hearing

13  officer due to the perceived conflict of interest in his roles

14  representing both Cady and Trevino. Gross Depo. at 56:3-7. Finally,

15  it is undisputed that Gross was selected by Jones and plaintiffs

16  have tendered some evidence of Jones' long-standing professional

17  and financial relationship with Cady. See Cady Depo. at 18:2-22:25,

18  23:12-24:2, 25:6-26:12. A reasonable jury might infer from this

19  that Jones was not impartial when recommending Gross as hearing

20  officer. These facts, while not dispositive, would permit a

21  reasonable jury to conclude that Board acted contrary to the

22  requirements of due process in selecting Gross as hearing officer

23  for the post-termination hearing. See Clements, 69 F.3d at 332;

24  Walker, 951 F.2d at 184.

25     Finally, a jury could also reasonably conclude that the LMUD's

26  delay in providing the post-termination hearing was itself a denial

of due process. As the Supreme Court has explained, whether a delay in the post-termination hearing constitutes a due process violation depends on the importance of the plaintiff's interest and the harm he would suffer as result of the delay, the state's reason for the delay and the underlying interest they serve, and the likelihood that the termination decision was erroneous. <u>Mathews</u>, 424 U.S. 319.

The Court has long acknowledged that an employee possesses an "important interest" in his continued employment. <u>Mallen</u>, 486 U.S. at 242 (citations omitted). In addition to this, plaintiffs have tendered evidence that Steven Trevino had a particularly strong interest in his continued employment due to his need for medical benefits for his wife, who was undergoing cancer treatment. Trevino Aff. ¶ 16.

Such an important interest cannot be overcome without a "substantial justification" for the state's delay of the post-termination hearing. <u>Mallen</u>, 486 U.S. at 242. Here, the plaintiffs have tendered evidence that Gross failed to hold the post-termination hearing within the 30 days recommended by LMUD's policies because he was too busy to do so. Gross Depo. at 53:7-16. A jury could reasonably conclude that this is not a sufficiently substantial justification for the delay.

Finally, there is evidence that the initial decision to terminate Steven Trevino was erroneous. The Board eventually reversed the decision and offered to reinstate him. One Board member has testified that he disagreed with Luhring's conclusion that Trevino's conduct on the golf course was of such a nature as

1  to discredit the District. Sargent Depo. at 40:12-22.

2  Accordingly, the court denies defendants' motion to the extent

3  that they argue that a reasonable jury would be required to find

4  that Steven Trevino received all the process he was due in his

5  termination proceedings.

6  **2.   Plaintiffs' Cross-Motion for Summary Judgment Against**

7  **LMUD**

8  Plaintiffs seek summary judgment in their favor against LMUD

9  on Steven Trevino's procedural due process claim, to the extent

10 that they seek injunctive relief. The court grants this motion in

11 part.

12 Defendants have offered no counter-evidence addressing the

13 Mathews factors, regarding the delay in the post-termination

14 hearing. It therefore remains undisputed that plaintiff had a

15 substantial interest in his continuing employment, that the only

16 evidence of the government's justification for the delay was the

17 business of the hearing officer, and that the termination decision

18 was later concluded to be erroneous by the Board, as discussed

19 above.[9]

20 Defendants' arguments in opposition to plaintiffs' motion are

21 unpersuasive. Defendants' sole basis for opposing plaintiffs'

22 motion is their assertion that plaintiffs have not shown that LMUD

23 is liable under Monell v. Dep't. of Soc. Servs., 436 U.S. 658, 691

24

25  [9]The court concludes, however, that plaintiffs have not shown
   that the evidence is so unequivocal that no reasonable jury could
26  find in defendants' favor as to the impartiality of Luhring and
   Gross and the adequacy of the pre-termination hearing.

1  (1978). See Defs.' Opp'n to Pls.' Mot. for Summ. J. at 11-15. This

2  is unpersuasive. Monell's requirement that a plaintiff may only

3  prevail against a state entity for Constitutional rights violations

4  when the violation occurred pursuant to a state policy, does not

5  apply when the plaintiff seeks only prospective relief. Chaloux v.

6  Killeen, 886 F.2d 247, 250 (9th Cir. 1989). In Chaloux, plaintiffs

7  sued Idaho sheriffs in their official capacities to prevent the

8  implementation of allegedly unconstitutional garnishment statutes.

9  Id. Plaintiffs sought declaratory and injunctive relief. Id. The

10 court held that Monell's "official policy or custom" requirement

11 applied only to actions for damages under § 1983, because the

12 statute's purpose was to "alleviate the imposition of financial

13 liability on local governments." Id. Because this concern was

14 absent when injunctive and declaratory relief was sought, the court

15 declined to apply the Monell limitation to such suits. Id. at 251.

16 Consequently, because plaintiffs only seek summary judgment on

17 their claims for injunctive relief, Monell is no impediment to the

18 success of their motion.[10]

19     To the extent that defendants intended to incorporate the

20 arguments in their motion for summary judgment into their

21 opposition to plaintiffs' motion, those arguments are also

22 unpersuasive. First, defendants argue that Trevino received back

23 pay for this period. See Defs.' Mot. for Summ. J. at 19 (citing

24 Defs.' SSUF ¶¶ 77-78, 88). This fact does not foreclose plaintiff's

25

26     [10]Moreover, as explained below, there is sufficient evidence
   from which a jury could impose Monell liability here.

26

procedural due process claim, especially given that plaintiffs'
motion for summary judgment seeks injunctive relief, not damages.
See, e.g., Clements, 69 F.3d at 332-34 (when defendant has violated
plaintiff's due process rights, plaintiff may recover damages for
emotional distress and nominal damages, in addition to the
compensatory damages sought).

Defendants also argue that Codd v. Velger, 429 U.S. 624, 627
(1977) (per curium) bars Trevino's recovery here. As stated in note
8, *supra*, that case dealt only with plaintiff's liberty interest
in his reputation and the process due in that circumstance. Aside
from a brief citation to Loudermill, defendants do not otherwise
discuss how the delay in the post-termination hearing relates to
plaintiff's property interest in his continued employment.

Accordingly, the court grants plaintiffs' motion for summary
judgment on the first cause of action, to the extent that it
alleges that Steven Trevino's procedural due process rights were
violated.

The court grants in part Steven Trevino's request for
injunctive relief. Plaintiffs seek an order reinstating Trevino and
requiring defendants to "strictly comply with the General Managers
Administrative Procedure (2006-03) should any future disciplinary
action be taken against Mr. Trevino." Generally speaking, the Ninth
Circuit has held that reinstatement is an appropriate form of
injunctive relief only where plaintiff has shown that "another
substantive right coexists with the right to procedural due
process." Brady, 859 F.2d at 1552. Relying on prior Ninth Circuit

1   and Supreme Court precedent, the Brady court concluded that in
2   general the proper remedy for a procedural due process violation
3   is to give the plaintiff the process he was due and attendant
4   damages. Id. (collecting cases). The court noted that it had only
5   ordered reinstatement in a few cases where there was an underlying
6   violation of plaintiff's First Amendment rights as well as a due
7   process violation. Id. (citing Burton v. Cascade Sch. Dist. Union
8   High Sch. No. 5, 512 F.2d 850 (9th Cir. 1975) and Cain v. McQueen,
9   580 F.2d 1001 (9th Cir. 1978)).

10      Here, LMUD has offered reinstatement and informed plaintiff
11  that defendant Cady is no longer General Manager there. In this
12  situation, the Brady court's concerns appear absent and
13  reinstatement appears to be an appropriate remedy. Although
14  plaintiff also requests that the court order the defendants to
15  comply strictly with GMAP 2006-03 during the entirety of his
16  employment, the court disfavors injunctions that would require
17  supervision from the court for many years or for an indefinite
18  period. See Natural Resources Def. Council v. United States Envtl.
19  Prot. Agency, 966 F.2d 1292, 1300 (9th Cir. 1992). Instead, the
20  court cautions the defendants that by reinstating plaintiff Steven
21  Trevino they have implicitly agreed to adhere to the due process
22  requirements imposed on them by law and described herein. Future
23  violations of these requirements, the court expects, may give rise
24  to another suit by plaintiffs.

25      **3.   Qualified Immunity of the Individual Defendants**
26      Defendants Cady and Luhring assert that they are entitled to

28

1  qualified immunity on plaintiffs' procedural due process claims.

2  The court grants defendant Cady's motion and denies defendant

3  Luhring's.

4          **i.    Defendant Cady**

5          Preliminarily, defendant Cady argues that he is not liable for

6  the deprivation of Steven Trevino's procedural due process rights

7  because he was not sufficiently involved in the discipline

8  proceedings so as to reasonably be found to have caused the

9  deprivation.

10         A government official is immune from liability for

11  discretionary functions, so long as the official's conduct "does

12  not violate clearly established statutory or constitutional rights

13  of which a reasonable person would have known." <u>Harlow v.</u>

14  <u>Fitzgerald</u>, 457 U.S. 800, 818 (1982). Here, plaintiffs appear not

15  to dispute that Cady's conduct at issue implicated a discretionary

16  function. In conducting a qualified immunity analysis, the court

17  must determine whether the facts, taken in the light most favorable

18  to the injured party, show that the official's conduct violated a

19  constitutional right. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

20         Even viewing the evidence in the light most favorable to

21  plaintiffs here, there is insufficient evidence from which a jury

22  could conclude that Cady caused the deprivation of the plaintiffs'

23  procedural due process rights. The evidence tendered to the court

24  shows that Cady initially placed Steven Trevino on administrative

25  leave; that immediately after the golf course incident, he

26  discussed it with Luhring and Jones; two days later he emailed

1   Jones, Luhring, and the Board relating his version of events and
2   opining that Steven Trevino was guilty of various crimes and LMUD
3   rule infractions; and that four days after the incident, he was
4   present at a closed personnel meeting with Jones and Luhring, the
5   result of which was Luhring being given the authority to act as
6   General Manager for the matter of Trevino's discipline.

7          As the court explained above, the evidence of the procedural
8   due process violations against Steven Trevino encompass the
9   adequacy of the pre-termination hearing, the impartiality of the
10  hearing officers, and the delay in the post-termination hearing.
11  Plaintiffs have not tendered any evidence establishing a causal
12  link between these possible violations and Cady's actions. Simply
13  because Cady set the discipline proceedings in motion initially
14  does not render him liable for the process that was eventually
15  provided. Even Cady's March 12, 2007 e-mail appears at most to
16  suggest what result Cady believed the discipline process should
17  have, but did not implicate the process provided. Nor is there any
18  evidence tendered that could lead a reasonable jury to conclude
19  that Cady was involved in the selection of Luhring or Gross as
20  hearing officers. Put plainly, plaintiffs have not borne their
21  burden to produce evidence permitting a reasonable jury to conclude
22  that Cady caused Steven Trevino's procedural due process
23  violations. Accordingly, Cady's motion for summary judgment is
24  granted as to that cause of action.

25                    **ii.  Defendant Luhring**

26         Defendant Luhring is not entitled to qualified immunity.

First, there is evidence from which a reasonable jury could conclude that Luhring caused Steven Trevino's due process violations. It is undisputed that as of March 14, 2007, Luhring was charged with acting as General Manager for the purposes of Trevino's discipline proceedings, which were governed not only by constitutional requirements but also by LMUD's policies as stated in GMAP 2006-03. Luhring conducted the pre-termination hearing on March 26, 2007, which, as discussed above, a jury could find to be constitutionally deficient. Additionally, although the evidence indicates that the delay in holding the post-termination hearing appeared to be most directly the result of Gross's actions, a reasonable jury could conclude that as acting General Manager for the purposes of the discipline matter, Luhring also bore some responsibility. As acting General Manager, he was charged with enforcing GMAP 2006-03, which provides that "[a]ll efforts shall be made to schedule the [posttermination] hearing within 30 days of the Notice of Appeal." Accordingly, a reasonable jury could find that Luhring caused Steven Trevino's procedural due process deprivations.

Second, the law governing Luhring's actions was clearly established at the time. Saucier, 533 U.S. at 201-202 (the second step of the qualified immunity analysis is whether the constitutional right was "clearly established" at the time of the violation, such that a reasonable official would have understood that his actions violated that right). The law regarding an employee's procedural due process rights surrounding termination

31

1  is  long  settled.  In  Loudermill,  the  Court  expressed  the
2  constitutional  importance  of  there  being  held  both  a  pre-
3  termination and prompt post-termination hearing. 470 U.S. at 546-
4  47. This principle has been reaffirmed over the last three decades
5  by both the Supreme Court and the Ninth Circuit. Mathews, 424 U.S.
6  319; Gilbert, 520 U.S. at 932; Mallen, 486 U.S. at 242; Vanelli,
7  667 F.2d at 778-79; see also Bd. of Regents v. Roth, 408 U.S. 564
8  (1972) (public  employee  has  a  property  interest  in  continued
9  employment, such that his procedural due process rights attach).
10  The Supreme Court and the Ninth Circuit have also long held that
11  the  Constitutional  adequacy  of  the  pre-termination  hearing  is
12  determined,  in  part,  by  the  process  provided  in  the  post-
13  termination hearing. Loudermill, 470 U.S. at 547 & n. 12; Clements,
14  69 F.3d at 332. In 1988, the Ninth Circuit expressly held that the
15  law governing procedural due process, specifically regarding the
16  process due at a pre-termination hearing and the factors used in
17  determining whether the delay in a post-termination hearing was
18  Constitutional, were clearly established. Brady, 859 F.2d at 1556.
19  Given that there has been no intervening change in law on these
20  issues, the law remained clearly established at the time of Steven
21  Trevino's disciplinary proceedings.

22      Given this, it appears clear that a reasonable official in
23  Luhring's position should have known that the process provided at
24  the pre-termination hearing and the delay in the post-termination
25  hearing violated Steven Trevino's rights. Defendant Luhring's
26  motion is therefore denied on the issue of qualified immunity for

1 the first cause of action.

2     **4.   Liability of LMUD**

3     As discussed above, summary judgment is granted to plaintiffs

4 against defendant LMUD to the extent that plaintiffs' first cause

5 of action seeks injunctive relief. Defendant argues that LMUD

6 cannot be liable for damages under Monell. The court denies

7 defendants' motion on this issue.

8     Municipal liability may be established in one of three ways.

9 See Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir. 1992). A

10 plaintiff may prove that the actions in question were conducted

11 pursuant to an official custom, policy, or practice; that the

12 individual who committed the act was an official with final

13 policymaking authority; or that such an official ratified a

14 subordinate's unconstitutional act. Id.; accord Monell v. New York

15 Dep't of Soc. Serv., 436 U.S. 658, 691 (1978); Weiner v. San Diego

16 County, 210 F.3d 1025, 1028 (9th Cir. 2000). An agency may not be

17 liable on a *respondeat superior* theory, but only if there is

18 evidence that there is "an affirmative link between the policy and

19 the specific constitutional violation alleged." City of Oklahoma

20 v. Tuttle, 471 U.S. 808, 821 (1985).

21     In explaining the second route to municipal liability -- that

22 a municipal policymaker committed the harm to plaintiff -- the

23 Supreme Court has explained that a policymaker is one who has been

24 granted final authority to enact the policy in question by the

25 legislature or had that authority delegated to him by an official

26 who possesses such authority. Pembaur v. City of Cincinnati, 475

1  U.S. 469, 482-83 (1986). In Pembaur, the Court explained this rule
2  in a city employment context. Using the example of a county
3  sheriff, the Court held that the county would not be liable for
4  employment decisions by the sheriff, even if the sheriff possessed
5  the authority to unilaterally hire and fire. Id. at 483 n. 12. This
6  did not constitute a "delegation" of county authority for Monell
7  purposes. Id. Instead, the county would only be liable if it had
8  delegated to the sheriff the final authority to "establish final
9  employment policy." Id.

10     Here, the policy governing employee discipline was set forth
11  in GMAP 2006-03. It was implemented pursuant to California Public
12  Utility Code § 11926 and § 11937. Ferrannini Decl. ¶ 4, Ex. C.
13  Section 11926 provides that the Board shall appoint the General
14  Manager, who has "full charge and control of . . . the
15  administration of business affairs of the district." Section 11937
16  provides that the powers of the General Manager include
17  "administer[ing] the civil service system of the district and . .
18  . to remove such employees, in accordance with the provisions of
19  the civil service system." The statute does not provide that these
20  decisions are subject to the Board's review. The civil service
21  system is set forth in Public Utility Code §§ 12161-12167. It
22  provides that the General Manager is the person responsible for
23  setting a discipline hearing, appointing a committee to conduct the
24  hearing, and review the committee's decision. Cal. Pub. Util. Code
25  §§ 12164-12166.

26     By statute, therefore, the General Manager is vested with the

final decision-making authority over termination decisions. California statute grants this to the General Manager directly and provides for no review by the Board of the General Manager's discipline decisions. This is in accord with GMAP 2006-03, which provides that it is made effective only upon approval by the General Manager. The parties do not dispute that the authority of the General Manager was delegated by the Board to Luhring on March 14, 2007 with respect to Trevino's discipline proceedings. Accordingly, as of that date Luhring acted as the final policy maker for the District. See Pembaur, 475 U.S. at 482-83. LMUD may therefore be liable for damages on plaintiffs' first cause of action.[11]

### 5.   Violation of Amy Trevino's Due Process Rights

Amy Trevino's procedural due process claims allege that the defendants violated her procedural and substantive due process rights by depriving her of her "constitutionally-protected right to be free from unconstitutional government-imposed impact to her marital relationship with her husband" and the "care,

---

[11] Moreover, even if one were to find that the Board rather than the General Manager possessed final policymaking authority over employment decisions, there is evidence from which a reasonable jury could find that the Board's own acts caused the plaintiffs' Constitutional deprivations. These acts include choosing Luhring to conduct the discipline proceedings despite the evidence that Luhring would not have reversed Cady's decision, choosing Gross as hearing officer for the post-termination hearing despite his possible conflict of interest, and possibly delaying the scheduling of regular Board meetings in May and June 2007, which a factfinder might infer was done for the purpose of delaying the post-termination hearing. See Cardenas Depo. at 28:13-29:5; Nagel Depo. at 25:21-26:13; Langston Depo. at 41:24-42:8; Luhring Depo. at 142:17-143:7.

1  companionship, society, and guidance of her husband." Third Amended

2  Complaint ¶¶ 45, 48, 69. As the court explained in its April 9,

3  2008 order, there is a recognized liberty interest in a person's

4  companionship with a family member, such that the state's

5  interference with it may constitute a violation of that person's

6  substantive or procedural due process rights. See Smith v. City of

7  Fontana, 818 F.2d 1411, 1419-20 (9th Cir. 1987) (overruled on other

8  grounds by Hodger-Durgin v. De La Fina, 199 F.3d 1037 (9th Cir.

9  1999)); see also Kelson v. City of Springfield, 767 F.2d 651, 654-

10  55 (9th Cir. 1985). This is cognizable as the basis of a § 1983

11  claim. Smith, 818 F.2d at 1420.

12  As they did in their motion to dismiss, the defendants again

13  rely on Trujillo v. Bd. of County Commissioners, 768 F.2d 1168,

14  1190 (10th Cir. 1985) for the proposition that Amy Trevino's claim

15  can only succeed if the defendants intended to interfere with her

16  marital relationship. This holding has been expressly rejected by

17  the Ninth Circuit. Ward v. City of San Jose, 967 F.2d 280, 284 (9th

18  Cir. 1991). The court explained as much in its April 9, 2008

19  order.[12] See Order, April 9, 2008 at 9. As the court explained,

20  "[t]he plaintiff need not show that the actor acted with malice in

21

22  [12]Defendants' counsel are reminded of their ethical duty to
    not knowingly make false representations of the law to the court.

23  See Local Rule 83-180(e) (requiring counsel to comply with the
    American Bar Association's Model Rules of Professional Conduct

24  where applicable); ABA Model Rules of Prof'l Conduct R. 3.3 &
    Comment 4 ("Legal argument based on a knowingly false

25  representation of law constitutes dishonesty toward the tribunal.
    A lawyer is not required to make a disinterested exposition of the

26  law, but must recognize the existence of pertinent legal
    authorities.").

1  order to succeed in this claim; a showing of deliberate

2  indifference or "more than mere[] negligen[ce]" is sufficient." <u>Id.</u>

3  (citations omitted)).

4      Amy Trevino's alleged due process violation appears to stem

5  entirely from defendants' conduct in the termination of Steven

6  Trevino. <u>See</u> Third Amended Complaint ¶¶ 45-75. As discussed above,

7  there is insufficient evidence that defendant Cady caused any of

8  the improprieties in the procedural due process afforded Steven

9  Trevino. As such, he similarly could not reasonably be found to

10 have caused any violation of Amy Trevino's liberty interest that

11 may have resulted from the Constitutionally infirm termination

12 proceedings.

13     Defendant Luhring argues that he are protected by qualified

14 immunity because a reasonable official in his positions would not

15 have known that his conduct violated Amy Trevino's constitutional

16 rights. The court agrees.

17     Even if defendant Luhring's actions violated Amy Trevino's

18 procedural due process rights, that she possessed such a right is

19 not clearly established such that a reasonable official in

20 Luhring's position would have known that his conduct violated those

21 rights.[13] <u>See</u> <u>Saucier</u>, 533 U.S. at 201-202. In order to be clearly

22 established, "the contours of the right must be sufficiently clear"

23 so as to be obvious to a reasonable official. <u>Anderson v.</u>

24 _____

25     [13] In <u>Pearson v. Callahan</u>, __ U.S. __, 2009 WL 128768 (Jan.
   21, 2009), the Court held that the qualified immunity analysis need
26 not proceed in the sequential manner set forth in <u>Saucier</u>.

1   <u>Creighton</u>, 483 U.S. 635, 640 (1978). To meet this standard, the
2   right alleged to be violated cannot be only the "general
3   constitutional guarantee (e.g., the Fourth Amendment freedom from
4   unreasonable searches and seizures), but its application in a
5   particular context." <u>Baker v. Racansky</u>, 887 F.2d 183, 186 (9th Cir.
6   1989) (citing <u>Anderson</u>, 483 U.S. at 639-40 and <u>Todd v. United</u>
7   <u>States</u>, 849 F.2d 365, 370 (9th Cir. 1988)).
8   There need not be case law directly on point in order for a right
9   to be considered clearly established, but the extant law must make
10  the right "apparent." <u>Anderson</u>, 483 U.S. at 640; <u>Hope v. Pelzer</u>,
11  536 U.S. 122 (2002).

12      Here, Amy Trevino's due process interest was not clearly
13  established at the time of Luhring's actions. The court recognized
14  in its April 9, 2008 order that there was no in-circuit precedent
15  for the proposition that a person possesses a liberty interest in
16  the companionship of her spouse. Order, April 9, 2008 at 10-12.
17  While previous cases had dealt with this interest in the context
18  of the parent-child relationship, the court concluded that the
19  reasoning behind the recognition of this interest seemed to apply
20  in equal force to a marital relationship, particularly given the
21  purpose of the Klu Klux Klan Act and the Court's longstanding
22  recognition of the importance of the marital relationship. <u>Id.</u>

23      The court cannot conclude that its understanding of this
24  liberty interest is such an inevitable extension of the Circuit's
25  precedent as to render Amy Trevino's liberty interest apparent to
26  a reasonable state official. Although the analogy between the

38

1  parent-child and marital relationship seems appropriate in the due

2  process context, at the time of alleged deprivation no court in

3  this circuit had held that the liberty interest extends to any

4  relationship beyond that of natural parent and child. See, e.g.,

5  Ward, 967 F.2d 280 (declining to extend it to a sibling

6  relationship); Santos v. County of Los Angeles Dep't of Children

7  and Family Servs., 299 F. Supp. 2d 1070, 1081 (C.D. Cal. 2004)

8  (declining to extend to aunt-nephew relationship). In light of

9  this, it would not have been apparent to a reasonable official in

10 Luhring's position that Amy Trevino's liberty interests may have

11 been violated as a result of the termination process provided to

12 Steven Trevino.

13    Although Luhring is entitled to qualified immunity, that

14 offers no defense to LMUD. Owen v. City of Independence, Missouri,

15 445 U.S. 662 (1980). As previously explained, there are facts from

16 which a reasonable jury could conclude that LMUD is liable under

17 Monell. Defendant LMUD's motion is therefore denied as to

18 plaintiffs' first cause of action to the extent that it alleges

19 violations of Amy Trevino's rights.

20    **6.  Plaintiffs' Causes of Action Based on Violations of**

21        **Their Substantive Due Process Rights**

22    In plaintiffs' second cause of action, they allege that

23 defendants' conduct in terminating Steven Trevino violated

24 plaintiffs' substantive due process rights. Their third cause of

25 action alleges defendants conspired to commit these deprivations.

26 In their opposition to defendants' motion, plaintiffs abandon their

39

1  causes of action premised on violations of their substantive due
2  process rights, conceding that they are moot. Pls.' Opp'n to Defs.'
3  Mot. for Summ. J. at 27-28. Nevertheless, they contend that they
4  are entitled to attorney's fees if they are found to be the
5  prevailing parties on this claim, if plaintiffs' filing suit
6  brought about the result they sought. See Clark v. City of Los
7  Angeles, 803 F.2d 989, 990 (9th Cir. 1986). Plaintiffs do not
8  themselves seek summary judgment on the issue of whether they are
9  the prevailing parties on this claim and, in any event, whether a
10 party is a prevailing party under § 1988 is not an issue for
11 summary judgment. Lewis v. Continental Bank Corp., 494 U.S. 472,
12 480 (1990).

13     Accordingly, defendants' motion for summary judgment is
14 granted as to plaintiffs' second and third causes of action to the
15 extent that they allege deprivations of plaintiffs' substantive due
16 process rights. This grant of summary judgment does not preclude
17 plaintiffs from presenting evidence at the appropriate time that
18 they are entitled to attorneys' fees for these causes of action.

19 **B.    Intentional Infliction of Emotional Distress Claim**

20     In their sixth cause of action, plaintiffs allege that
21 defendants' conduct surrounding Steven Trevino's termination was
22 extreme and outrageous and intended to cause plaintiffs emotional
23 distress. Plaintiffs allege that it did cause them severe emotional
24 distress. Third Amended Complaint ¶ 87.

25     Defendants seek summary judgment on two grounds. First, they
26 contend that there is insufficient evidence from which a jury could

1  conclude that defendants' conduct was "outrageous," which is an
2  element of the cause of action. See Christensen v. Sup. Court, 54
3  Cal. 3d 868, 903 (1991). Second, they argue that there is
4  insufficient evidence that the defendants acted with the intent to
5  cause emotional distress. The court denies defendants' motion on
6  this cause of action.

7  First, there is sufficient evidence of outrageous conduct such
8  that a reasonable jury could find in plaintiffs' favor. California
9  courts have held that employer conduct may be extreme and
10 outrageous for the purpose of this tort. See, e.g., Rojo v. Kliger,
11 52 Cal. 3d 65 (1990). Here, defendants describe their conduct as
12 "a quintessential personnel management decision." Defs.' Mot. for
13 Summ. J. at 23. Reasonable minds could differ, however, as to
14 whether this is an appropriate characterization. Viewing the
15 evidence in the light most favorable to the plaintiffs, a jury
16 could find that defendants' conduct, beginning with Cady's conduct
17 on March 10, 2007 and through the period after Trevino was
18 terminated and awaiting a post-termination hearing, was so outside
19 the bounds of civilized behavior as to be outrageous.

20 Second, there is sufficient evidence of intent to permit a
21 reasonable jury to find that this element has been met.[14] As the

---

23 [14]Defendants' argument that plaintiffs' claim fails because
24 plaintiffs failed to comply with the presentment requirement is not
   persuasive. As the court explained in its January 29, 2008 order,
   a plaintiff need not comply with the presentment requirement if he
25 has pled that defendant committed an intentional tort and names the
   state agency and individual state actor as co-defendants. See Cal.
26 Gov't Code § 815.3. Those elements were pled here.

1  California Supreme Court explained in <u>Christensen</u>, intentionality
2  can be met with evidence that the defendant acted with reckless
3  disregard to the plaintiffs' rights or that defendant's conduct was
4  directed at plaintiffs. 54 Cal. 3d at 903-905 (collecting cases).
5  Here, there is no dispute that defendants' conduct was directed at
6  Steven Trevino, in the sense that his claim is premised on
7  defendants' conduct in his termination proceedings. In other words,
8  defendants were not acting as mere bystanders to Steven Trevino's
9  injury. <u>See</u> <u>id.</u> at 904 (holding that where the defendants failed
10 to intervene to stop the injury to another or where plaintiff was
11 a bystander observing injury to another, there was insufficient
12 evidence of intentionality).

13      There is also sufficient evidence from which a reasonable jury
14 could find that defendants acted with reckless disregard to Amy
15 Trevino's rights. In a similar case, the California Court of
16 Appeals has held that an employer can be liable for intentional
17 infliction of emotional distress to an employee's spouse resulting
18 from the employee's wrongful termination and loss of medical
19 benefits. <u>Waye v. Rollins Int'l, Inc.</u>, 169 Cal. App. 3d 1, 17
20 (1985). Given that there is evidence that defendants knew that
21 Steven Trevino was married and that Amy Trevino was receiving
22 treatment for a serious health condition, <u>see</u> Luhring Depo. at
23 79:10-80:20, per <u>Waye</u>, this appears to suffice to permit a jury to
24 conclude that defendants acted with reckless disregard to the
25 emotional distress their conduct would cause her.
26 ////

**C.   Claim for Failure to Provide Public Records**

In their eighth cause of action, plaintiffs allege that defendant LMUD violated California Government Code § 53060.3 and Labor Code § 1198.5 by failing to provide Steven Trevino with his personnel file when he requested it. The parties agree that Steven Trevino requested his personnel file, through his counsel, on August 14, 2007 and that LMUD provided it to him on November 9, 2007. Defendant argues that there is no private right of action for these statutes.

California Government Code § 53060.6 provides that "[e]very employee of a local agency has the right to inspect personnel records pursuant to Section 1198.5 of the Labor Code." Labor Code § 1198.5 provides that, "[e]very employee has the right to inspect the personnel records that the employer maintains relating to the employee's performance or to any grievance concerning the employee." The employer "shall" make the contents of the personnel records available to the employee "at reasonable intervals and at reasonable times." Cal. Labor Code § 1198.5(b). The statute also provides that the requirements therein are "minimum standards" for an employee's inspection of his personnel file. Id. § 1198.5(g).

Preliminarily, plaintiffs have tendered no facts from which a jury could find that Amy Trevino's statutory rights were violated. Plaintiffs do not allege, let alone tender facts that show, that Amy Trevino requested Steven Trevino's personnel file. Nor has she alleged or shown that she was damaged by LMUD's failure to timely provide the file. The plaintiffs apparently acknowledge

1  as much, as they do not oppose defendants' motion as to Amy
2  Trevino. Accordingly, defendants' motion is granted on plaintiffs'
3  eighth cause of action as to Amy Trevino.

4     The court disagrees with defendants' contention that there is
5  no private right of action for violations of these statutes. Under
6  California law, a public entity is liable for injuries proximately
7  caused by its failure to discharge a mandatory duty created by an
8  enactment and designed to protect against the particular injury
9  alleged, unless the public entity has been reasonably diligent in
10 attempting to discharge its duty. Cal. Gov't Code § 815.6. Whether
11 a statute imposes a mandatory duty is determined by considering the
12 legislative intent, as evinced by the language of the statute as
13 well as other factors. <u>Nunn v. State of Cal.</u>, 35 Cal. 3d 616, 624-
14 25 (1984).

15    Here, the language of the statutes at issue and other evidence
16 of legislative intent indicate that LMUD had a mandatory duty to
17 provide Steven Trevino access to his personnel file. Both
18 Government Code § 53060.6 and Labor Code § 1198.5 frame the
19 employer's duty in terms of the employee's right to view his
20 personnel record. In light of this construction, it seems
21 antithetical to the purpose of either statute that the legislature
22 intended to suggest that that right could be disregarded by the
23 employer. The court's interpretation is supported by the
24 legislature's express intent in passing Government Code § 53060.6,
25 where it found and declared that, "the right of employees to
26 inspect personnel files is a fundamental right of employment . .

1   . ." S.B. 1327 § 12 (2000). Finally, Labor Code § 1198.5 clarifies

2 that the requirements contained therein were minimum standards,

3 suggesting that the employer has a mandatory duty to adhere to them

4 but discretion to create additional access to personnel files if

5 it so chose.

6     The court is similarly unpersuaded that Steven Trevino does

7 not fall under the ambit of the statutes and that the injury of

8 which he complains is not the type of injury the statutes were

9 meant to address. Although Steven Trevino had been terminated prior

10 to his request for his personnel file, his request was made in

11 advance of his post-termination hearing. Given the importance of

12 the post-termination hearing both by due process standards, as

13 discussed above, and within the procedures set forth in GMAP 2006-

14 03, his interest in his file related to a key element of his

15 discipline proceedings. Because the statutes were enacted for the

16 purpose of protecting employees' employment rights and because the

17 post-termination hearing is an essential component of those rights,

18 Steven Trevino was undoubtedly in the class of persons the statute

19 was designed to protect.

20     His injury was also the type that the statutes were intended

21 to avoid. Defendants characterize plaintiff's injury simply as the

22 incurrence of attorneys' fees. This seems to miss the point. Labor

23 Code § 1198.5 expressly requires that employers make personnel

24 files available "at reasonable intervals and at reasonable times."

25 Cal. Labor Code § 1198.5(b). In other words, timely inspection of

26 the file is an interest acknowledged and protected by the statute.

1   Necessarily, then, the harm the legislature sought to avoid was the

2   employee having to expend time and resources to convince or cajole

3   his employer into providing him access to his personnel file. That

4   is essentially the harm Steven Trevino has presented evidence of

5   here. Defendants' motion is therefore denied on plaintiff's eighth

6   cause of action as to Steven Trevino.

7                              **IV. CONCLUSION**

8        For the reasons stated herein, defendants' motion for summary

9   judgment (Doc. No. 84) is GRANTED IN PART AND DENIED IN PART.

10  Plaintiffs' motion for partial summary judgment (Doc. No. 88) is

11  GRANTED IN PART AND DENIED IN PART.

12       Defendant LMUD is ORDERED to reinstate plaintiff Steven

13  Trevino to the position he held at the time of his termination.

14       IT IS SO ORDERED.

15       DATED:  February 12, 2009.

16

17

18                              LAWRENCE K. KARLTON
                                SENIOR JUDGE
19                              UNITED STATES DISTRICT COURT

20

21

22

23

24

25

26

                                    46